## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: HON. JANE A. RESTANI, *JUDGE***

-------------------------------------------------------X
TARGET CORPORATION,             :
                                  :
      **Plaintiff,**           :
                                  :
        *v.*               :      **Court No. 10-00353**
                                  :
**THE UNITED STATES,**       :      <u>**PUBLIC VERSION—**</u>
                                  :      **BUSINESS PROPRIETARY**
                                  :      **INFORMATION REDACTED**
      **Defendant.**         :
-------------------------------------------------------X

### SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION AGAINST <u>LIQUIDATION OF CERTAIN ENTRIES</u>

### I.  INTRODUCTION

Plaintiff Target Corporation ("Target") submits this Supplemental Memorandum of Points and Authorities[1] in support of its Application for a Preliminary Injunction, *pendente lite*, against the liquidation by United States Customs and Border Protection (CBP) of certain entries of *Certain Cased Pencils from the People's Republic of China* entered at the Port of Savannah, Georgia during the period December 1, 2007 through November 30, 2008.[2]  This memorandum provides additional information, based on review of confidential administrative record documents and unpublished

---

[1] Leave of Court for this submission was granted at the December 16, 2010 joint temporary restraining order/preliminary injunction in this case and in *Walgreen Co. v. United States*, No. 10-00373.

[2] Plaintiff reserves the right to seek preliminary injunctive relief in respect of the liquidation of subject entries at other ports of entry, should cause for such an application arise.

1

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

Department of Commerce ("Commerce") liquidation instructions, demonstrating that Plaintiff has a likelihood of success on the merits of this action.

As demonstrated herein, the confidential liquidation instructions that Commerce issued to CBP with respect to certain cased pencils produced and sold for export by China First Pencil Co. ("China First") and Shanghai Three Star Stationery Company ("Three Star") are facially and substantively inconsistent with the Final Results of Commerce's annual review of the antidumping order on *Certain Cased Pencils from the People's Republic of China*, 75 Fed. Reg. 38,980 (July 7, 2009). The instructions also contravene the requirements of the antidumping statute and Commerce's own regulations. For the reasons discussed herein, and those previously furnished, Target submits that it has demonstrated a sufficient likelihood of success on the merits of this action that, combined with the additional considerations for issuance of an injunction previously addressed, a preliminary injunction should be issued to preserve the *status quo* pending resolution of this action.

## II.   BACKGROUND FACTS

Pursuant to 19 U.S.C. § 1675(a), Commerce conducted an annual review of the outstanding antidumping order against *Certain Cased Pencils from the People's Republic of China* covering the period December 1, 2007 through November 30, 2008. China First and Three Star were selected as "mandatory respondents" and were issued Commerce questionnaires seeking, *inter alia*, information concerning each company's export sales of subject merchandise during the review period.

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

Both China First and Three Star submitted extensive responses showing their respective export sales, and reporting export prices for each.  The data reported was in every case consistent with the statutory definition of "export price":

> The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

19 U.S.C. § 1677a(a) (1994).  In each case, China First and Three Star identified the customer for the export sale, and the questionnaire responses indicate (1) the terms of delivery, which indicated that the sale was a sale for exportation [[  ]], and (2) the destination of the merchandise sold, which was in all cases [[  ]].  *See* Confidential Exhibit A (China First); Confidential Exhibit B (Three Star).  There is no doubt that all of the reported sales were for export to the United States.

Commerce used these sales to determine the "export price" of the goods sold by China First and Three Star.  As discussed below, of the fifty (50) sales of China First or Three Star pencils that are incorporated in Target's Savannah entries for which liquidation has been temporarily enjoined, Target has been able to identify all fifty (50) in the databases that Commerce used to calculate "export price" in the review.  *See* Confidential Exhibit C.

In some cases, Target was the customer identified for export sales reported by [[  ]].  In all other cases, other companies were identified as the customers in the export price sales.  Target purchased the pencils from these companies **after** the export price sales had occurred.[3]  However,

---

[3] There are a number of reasons why Target might purchase pencils from a China First or Three Star customer, rather than purchasing directly from China First or Three Star.  Most

3

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[   ]]).**

it is unquestioned that, in every case where Target imported the subject pencils, (1) China First and/or Three Star knew the goods were destined for the United States, (2) they sold the goods at prices reported as the export prices for the goods, and (3) Commerce found the reported prices to be the "export prices" for the subject pencils.

Using the reported export prices, Commerce calculated antidumping margins in its administrative review. It calculated separate margins of dumping for China First (1.00%) and Three Star (6.10%). As the Final Results indicate, it then calculated assessment rates, described as "exporter/importer-specific" rates or "customer-specific" rates, and, in the case of China First and Three Star, as a "per unit assessment rate for each importer (or customer)," 75 Fed. Reg. at 38,982. However, as discussed below, the confidential liquidation instructions that Commerce issued to CBP purported to assess duties on a different basis than specified in the Final Results, specifically, using "exporter tied" rates not identified in the Final Results. Furthermore, CBP officials, relying on the liquidation instructions, have proposed to assess antidumping duties on Target's entries of China First and Three Star pencils not using the importer or customer rates for these firms, but instead on the basis of the "PRC-Wide Entity" rate of 114.90% *ad valorem*.

---

commonly, the customer might have rights to make pencils bearing a particular trademarked character (*e.g.*, "Barbie," "Hannah Montana"), necessitating a sale through a licensee.

As noted in the *Affirmation of Jessica Libby*, submitted with Target's Application for a Preliminary Injunction, in every case where Target acted as importer of record of the subject pencils, China First or Three Star **knew, or had reason to know**, that the pencils were destined for the United States. The factories had been supplied with Target's packaging specifications and UPCs. The products bore Target product numbers, and were available for sale only in Target stores. In certain cases, Target representatives toured the foreign production facility to inspect the production of the merchandise.

4

PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double
Brackets ([[  ]]).

## III.   ANALYSIS

**A.      The Liquidation Instructions for China First and Three Star Facially Inconsistent
With the Final Results for these Mandatory Respondents**

The Final Results indicate that Commerce used the reported export sales by China First and

Three Star as the basis for determining the export price of the pencils pursuant to 19 U.S.C.

§ 1677a(a).   An *ad valorem* rate of dumping was established for each respondent, including China

First and Three Star.   Commerce then indicated that it was calculating "exporter/importer-specific"

or "customer-specific" assessment rates (although Commerce did not indicate which respondents

were receiving which type of rate).   The Final Results indicate:

> In accordance with 19 CFR 351.212(b)(1), we calculated exporter/importer-specific
> (or customer-specific) assessment rates for merchandise subject to this review.

75 Fed. Reg. at 38,982.

In the case of China First and Three Star, the rates were of the customer-specific variety.   The

Final Results explain:

> China First and Three Star did not report entered values for their U.S. sales.
> Therefore, **we calculated a per-unit assessment for each importer (or customer)**
> by dividing the total dumping margins **for reviewed sales** to that party by the total
> sales quantity associated with those transactions.   For duty assessment rates
> calculated on this basis, we will direct CBP to assess the resulting per-unit rate
> against the entered quantity of the subject merchandise.   To determine whether the
> duty assessment rates are *de minimis*, in accordance with the requirement set forth
> in 19 CFR 351.106(c)(2), we calculated importer (or customer)-specific *ad valorem*
> ratios based on the estimated entered value.   Where an importer-specific (or
> customer-specific) rate is *de minimis* (*i.e.*, less than 0.50 percent), the Department
> will instruct CBP to liquidate that importer's (or customer's) entries without regard
> to antidumping duties.

*Ibid.*  Thus, the type of antidumping assessments to be made in respect of China First and Three-Star entries were clearly stated to be "importer-specific" or "customer-specific" rates.

However, the final confidential liquidation instructions do not establish "importer-specific" or "customer-specific" rates.  Instead, they appear to establish some type of "exporter-tied" rates, which link exporter-to-importer or exporter-to-customer.  This is **not** how the Final Results indicated antidumping duties would be assessed.

Thus, the confidential liquidation instructions for China First sales, issued as CBP Administrative Message No. 0214307 (Aug. 2, 2010), state, in pertinent part:

[[  ]].[4]

AR-1096 to -1098.  These rates are not "importer-specific" rates or "customer-specific" rates of the kind specified in the Final Results. They are, instead, "exporter-tied" rates of a type not previously seen in connection with this antidumping order (or others, to Plaintiff's knowledge).  No mention was made of such "exporter-tied" rates in the Final Results for China First or Three Star.  Rather, the Final Results indicated that, in respect of China First, Commerce had calculated a "per-unit assessment rate for each importer (or customer)," 75 Fed. Reg. at 38,982.

Moreover, the Liquidation Instructions reflect *de minimis* rates for the two customers listed above. The Final Results indicated that *de minimis* rates were calculated based on "importer (or customer)-specific *ad valorem* ratios based on the estimated entered value." *Ibid.*  Here again, there is no mention of any specific "exporter" requirement or pairing in respect of these *de minimis* rates.

---

[4] The quoted excerpt includes only Target and customers who purchased pencils later imported by Target.

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

The confidential liquidation instructions for China First pencils, being "exporter-tied," are thus inconsistent with the rates announced in the Final Results.[5]  The Final Results contain absolutely no reference to the issuance of such assessment rates in respect of China First pencils.

The same inconsistency obtains with respect to the liquidation instructions issued with respect to Three Star pencils.  The confidential instructions, issued as CBP Administrative Message No. 0214304 (Aug. 2, 2010), state, in pertinent part:

[[  ]].[6]

AR-1102 to -1106.  As in the case of China First, these are not "importer-specific" or "customer-specific" rates of the kind specified in the Final Results.  They are, instead, "exporter-tied" rates.  No mention was made of such paired or tied rates in the Final Results, which instead speak of a "per-unit assessment rate for each importer (or customer)," 75 Fed. Reg. at 38,982.  Moreover, the *de minimis* rates for  two of the Three Star customers listed above are also paired to exporter status, although the Final Results indicated that *de minimis* rates were calculated based on "importer (or customer)-specific *ad valorem* ratios based on the estimated entered value."  *Ibid.*

Thus, the liquidation instructions issued by Commerce with respect to China First and Three Star are facially inconsistent with the Final Results.  The inconsistency indicates that (1) the instant challenge is properly made against the legal sufficiency of the liquidation instructions (rather than as a challenge to the Final Results or any CBP action), and (2) Plaintiffs are able to state a *prima*

---

[5] In addition, the China First liquidation instructions contain a reference to [[  ]].

[6] Here again, only rates for those customers who purchased the pencils imported by Target are listed.

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

*facie* case for judicial review of the liquidation instructions. This supports the notion that Plaintiff

has a likelihood of success on the merits.

2.      <u>The Liquidation Instructions Are Inconsistent with 19 C.F.R. §351.212(b)(1)</u>

The Final Results indicate that Commerce's decision to establish importer-specific or

customer-specific antidumping assessment rates is undertaken pursuant to 19 C.F.R. § 351.212(b)(1).

That regulation provides:

> *(b) Assessment of antidumping and countervailing duties as the result of a review –*
> *(1) Antidumping duties.*
>
> If the Secretary has conducted a review of an antidumping order under §351.213 (administrative review), §351.214 (new shipper review), or §351.215 (expedited antidumping review), the Secretary normally will calculate **an assessment rate for each importer of subject merchandise covered by the review.** The Secretary normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes. The Secretary then will instruct the Customs Service to assess antidumping duties by applying the assessment rate to the entered value of the merchandise.

*Ibid.* (emphasis added).

By its terms, the regulation authorizes Commerce to calculate "an assessment rate for each

importer" of subject merchandise covered by the review.  It does not authorize the publication of a

combination "exporter/importer" or "exporter/customer" rate of the kind found in the confidential

liquidation instructions challenged here.  While, in the case of certain antidumping investigations

involving non-market economy (NME) countries, Commerce may calculate "combination" rates

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

(pairing particular producers with exporters for purposes of cash deposit rates),[7] there is nothing suggesting that antidumping assessments may be based on pairings of "exporters" and "importers" or pairings of "exporters and "customers."

Indeed, the antidumping statute authorizes entry-specific and importer-specific assessments of antidumping duties, but it does not authorize Commerce to determine assessments at the exporter level.  This was recently made clear in *KYD, Inc. v. United States*, 704 F. Supp. 2d  1323, 1332 (Ct. Int'l Trade 2010), where this Court noted:

> **However, Commerce is not directed to determine dumping margins at an exporter level.**  Rather, it is directed by Congress to determine the normal value and

---

[7] International Trade Administration *Policy Bulletin 05.1* dated April 5, 2005.  In discussing the use of exporter-producer "combination rates" in NME country antidumping investigations, the Bulletin states, in pertinent part:

> While continuing the practice of assigning separate rates only to exporters, all separate rates that the Department will now assign in its NME investigations will be specific to those producers that supplied the exporter during the period of investigation.  Note, however, that one rate is calculated for the exporter and all of the producers which supplied subject merchandise to it during the period of investigation.  This practice applies both to mandatory respondents receiving an individually calculated separate rate as well as the pool of non-investigated firms receiving the weighted average of the individually calculated rates.  This practice is referred to as the application of "combination rates" because such rates apply to specific combinations of exporters and one or more producers.  The cash-deposit rate assigned to an exporter will apply only to merchandise *both* exported by the firm in question *and* produced by a firm that supplied the exporter during the period of investigation. This practice is similar to the Department's established practice in cases where firms are excluded from an antidumping duty order (*i.e.*, due to zero or *de minimis* margins) and in new shipper reviews, both of which use exporter-producer combination rates.

The "combination rate" policy applies only in investigations, and only to NME country antidumping investigations commenced in 2005 or later.

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

export price of—and the dumping margin for—"*each entry* of the subject merchandise." 19 U.S.C. § 1675(a)(2)(A) (emphasis added).  As Commerce's own regulation states, Commerce "normally will calculate an assessment rate for each importer of subject merchandise covered by" an administrative review and "normally will calculate [that] assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes." 19 C.F.R. § 351.212(b)(1); *see also* Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,314–15 (May 19, 1997) (justifying Commerce's prior shift from an entry-specific assessment method to an importer-specific assessment method); Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,316–17 (Feb. 27, 1996) ("To the extent possible, these assessment rates will be specific to each importer, because the amount of duties assessed should correspond to the degree of dumping reflected in the price paid by each importer.").

*Ibid.* (emphasis added).

Thus, Commerce is not authorized to "determine dumping duties at the exporter level". It may determine antidumping duties on an entry-specific level or—as done in this case pursuant to 19 C.F.R. § 351.2212(b)(1)—on an importer-specific level.[8]  However, it cannot assess antidumping

---

[8] For purposes of this action Target accepts that a "customer-specific" assessment rate is equivalent to an "importer-specific" rate.  Commerce presumably announced an intention to use "customer specific" rates because China First and Three Star "did not report entered values for their U.S. sales," 75 Fed. Reg. at 38,982. Indeed, the antidumping questionnaire response for China First indicates, on page C-26, that [[  ]]. AR-490.  Similarly, Three Star reported, on page C-26 of its questionnaire response, that [[  ]].  AR-915.

Also supporting the notion that the China First and Three Star assessment rates were "customer-specific" is the agency's statement that it determined which customers or importers had *de minimis* rates was based on "the **estimated** entered value," *see* 75 Fed. Reg at 38,982 (emphasis added).

One might potentially question whether, in the absence of information concerning the identity of importers of record, Commerce should have calculated customer-specific rates, rather than direct CBP to make an entry-by-entry assessment of antidumping duties.  But such a challenge would need to be made under 28 U.S.C. § 1581(c), and Target makes no such challenge.

Target accepts the use of "customer-specific" or "importer-specific" rates.  What Customs

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

duties at an exporter level, and there is nothing in the Final Results, which speak of "a per-unit assessment rate for each importer (or customer)" of China First and Three Star, from which an exporter-tied assessment rate could have been gleaned.  It is only in the liquidation instructions that the concept of an "exporter-tied" assessment rate is raised.

Such an "exporter-tied" assessment rate is not only inconsistent with the Final Results and 19 C.F.R. § 351.212(b)(1), it is also inconsistent with the requirements of the antidumping statute.  As the Court of Appeals for the Federal Circuit recently noted in another case also captioned *KYD Inc. v. United States*, 607 F.3d 760 (Fed. Cir. 2010), "Under the antidumping statute, Commerce is directed to set the assessment rate based on the calculated antidumping margin."  When Commerce publishes an *ad valorem* dumping margin for a foreign exporter, it is in effect directing CBP to make an entry-specific assessment of antidumping duties.  The agency, may also in its Final Results, direct an importer-specific rate of duty pursuant to 19 C.F.R. § 351.212(b)(1), and issue confidential liquidation instructions directing Customs to so make assessments. See *Am. Signature, Inc. v. United States*, 598 F.3d 816 (Fed. Cir. 2009).  What the liquidation instructions may not do, however, is establish an "exporter level" antidumping rate (whether or not paired with specific "customers" or "importers").  That is what the liquidation instructions in this case do, however.

The liquidation instructions correctly indicate that, in assessing antidumping duties, CBP is to indicate whether the subject merchandise was the merchandise [[  ]].  AR-1096, -1102.  This

---

challenges is the language in the liquidation instructions which indicates that such rates are "exporter tied."  That language appears solely in the liquidation instructions.

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

merely directs CBP to determine whether the merchandise under question is the merchandise on which the "calculated antidumping margin" was determined, *see KYD*.  [As Target has indicated, in the case of its Savannah entries, the company can establish—in 50 out of 50 instances—that the merchandise is the merchandise on which the margin was calculated, linking each import back to one of the sales listed in the China First or Three Star database of export sales].  But there is nothing in any statute or regulation which authorizes Commerce to limit or condition such an importer-specific calculation based on the identity of the "exporter" of the merchandise, and the liquidation instructions at issue are unlawful to the extent they purport to impose such a restriction or limitation.

3.      **The Instant Case Does Not Involve "Resales" or "Resellers."**

        At the December 16 hearing, there was speculation both by the Court and government counsel of the possibility of "resales" or "resellers" being involved in the instant case.  There was discussion of resales occurring within China, or resales occurring after the goods were imported into the United States.  In fact, no "resales" are involved in this case, and Commerce's "reseller policy" (which by its terms applies only to market economy country cases) is not implicated here.

        Commerce's "Reseller Policy," 68 Fed. Reg. 23,954 (May 6, 2003), deals with the question of when merchandise subject to an antidumping order, and sold by a reseller, may be subject to automatic liquidation at cash deposit rates in cases where Commerce did not conduct a review of the

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

sales by the producer of the merchandise.[9]  That, of course, is not the circumstance presented here.

In this case, there was an administrative review conducted of the producers of the merchandise in question—China First and Three Star.

Where a review of the producer is requested and conducted, the producer's sales form the basis of the export price for the goods in question, and antidumping duties are assessed based on that price.  As Commerce has indicated:

> If, in the course of an administrative review, the Department determines that the producer knew, or should have known, that the merchandise it sold to the reseller was destined for the United States, the reseller's merchandise will be liquidated at the producer's assessment rate which the Department calculates for the producer in the review. If, on the other hand, the Department determines in the administrative review that the producer did not know that the merchandise it sold to the reseller was destined for the United States, the reseller's merchandise will not be liquidated at the assessment rate the Department determines for the producer or automatically at the rate required as a deposit at the time of entry. In that situation, the entries of merchandise from the reseller during the period of review will be liquidated at the all others rate if there was no company specific review of the reseller for that review period.

*Ibid.*  The question here is whether Commerce determined that merchandise sold to firms  identified as "customers" was "destined for the United States."  It appears that, with respect to the sales that

---

[9] Commerce stated its position as follows:

As described in the October 15, 1998, **Federal Register** notice, automatic liquidation at the cash-deposit rate required at the time of entry can only apply to a reseller which does not have its own rate if no administrative review has been requested, either of the reseller or of any producer of merchandise the reseller exported to the United States.

68 Fed. Reg. at 23,954.

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

Commerce used to calculate export price, the producers knew the goods were indeed destined for the United States,[10] and Commerce so determined.

Commerce has interpreted the phrase "for exportation to the United States" to mean that the seller or manufacturer from whom the merchandise was purchased knew or should have known at the time of the sale that the merchandise was being exported to the United States. *See Peer Bearing Co. v. United States*, 16 C.I.T. 799, 803–04 (1992). Here, Commerce presumably found that Three Star and China First knew that the merchandise reported in their respective questionnaire response was for export to the United States. Such a finding is supported by the questionnaire responses, which indicate, in every case, the United States is the destination, and in some cases identify the United States port of importation and final destinations.

That only the first sale or the producer's sale is considered when looking at multi-tiered sales transactions is further supported by the legislative history of the term "export price." The precursor term to "export price" was a term known as "purchase price" which is not used in the current statute. *Yue Pak v. United States*, 20 C.I.T. 495, 498 (1996). This Court has held that applying the legislative history, it is the producer's sale to a customer (including a middleman) that determines the basis for calculating the "purchase price", or in this case the "export price." In *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752, 759 (2001). This Court stated,

---

[10]   While the China First and Three Star questionnaire responses suggest that [[  ]], AR-25, -727, it appears that Commerce determined that the sales which each company listed on their respective databases were sales which the companies **did** know were destined for the United States. Had Commerce determined otherwise, it would not have used any of these sales in calculating the export price, and consequently, the dumping margins, for the goods. It is Commerce's determination, rather than the producer's characterization, which governs.

14

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

> This legislative history relates to a term—"purchase price"—which is not employed in the current version of the cited statutory subsection. In any event, this legislative history would appear to support Tung Mung's position, because it provides that "if a producer knew that the merchandise was intended for sale to an unrelated purchaser in the United States under terms of sale fixed on or before the date of importation, the producer's sale price to an unrelated middleman will be used as the purchase price." S. Rep. No. 96-249 at 94 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 480; and H.R. Rep. No. 96-317 at 75 (1979) (emphasis added). While that history goes on to indicate that Commerce should examine sales to and by middlemen to avoid below cost sales by the middlemen, that latter comment does not speak to or modify the purchase price definition.

*Ibid.* Thus, absent a middleman dumping inquiry—which is not at issue here—export price is based on the first sale, and here, that first sale is between the producer and the customers identified in the administrative review.[11]

In each case, the producers reported the United States as the destination of the merchandise, in many cases indicating both the United States port of importation and final destination. Such evidence clearly supports Commerce's determination, evident from the Final Results, that both China First and Three Star made sales "for export to the United States." In addition, all of the sales in question were made by China First and Three Star on terms indicating exportation from China, [[  ]].

Had Commerce determined that China First and Three Star were not aware that the merchandise was destined for exportation to the United States, then these sales could not lawfully have been included in the calculation of "export price" pursuant to 19 U.S.C. § 1677a(a). Commerce cannot determine that the sales in question were in fact export sales pursuant to the aforesaid

---

[11] The statutory definition of "export price" applies to NME and market economy cases as well.

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[   ]]).**

§ 1677a(a), and then disclaim that determination (as it appeared to do during the December 16, 2010 hearing). The only question is whether the import entries subject to antidumping assessment were the sales which were the basis of the antidumping determination. As shown in Confidential Exhibit C, Target has proven – in 50 cases out of 50 – that its merchandise is in fact the same merchandise on which Commerce calculated export prices for China First and Three Star. The entries are therefore entitled, as a matter of law, to be assessed with antidumping duties at the rates calculated in respect of China First and Three Star goods. As Commerce itself has admitted, "If, in the course of an administrative review, the Department determines that the producer knew, or should have known, that the merchandise it sold to the reseller was destined for the United States, the reseller's merchandise will be liquidated at the producer's assessment rate which the Department calculates for the producer in the review." 68 Fed. Reg. at 23,954. That is precisely what should occur in this case: Target's merchandise should be assessed with antidumping duties according to the importer-specific and customer-specific rates calculated by Commerce and referred to in the Final Results.

What frustrates the objective of that right, however, is not the Final Results – which correctly calls for entries of China First and Three Star pencils to be liquidated according to "a per-unit assessment rate for each importer (or customer)," 75 Fed. Reg. at 38,982. It is, rather, the challenged Liquidation Instructions, which improperly depart from the Final Results to establish "exporter-tied" rates neither identified in the Final Results nor countenanced by statute or regulation.

## IV.  CONCLUSION

**PUBLIC VERSION—Redacted Business Proprietary Information Indicated by Double Brackets ([[  ]]).**

As discussed above, the liquidation instructions challenged in this action are inconsistent with the Final Results of Commerce's administrative review of the antidumping order, and are inconsistent with law and regulation.  Moreover, the use of "exporter-tied" assessment rates for pencils produced and sold by China First or Three Star is not reflected in the Final Results, but is purely a creature of the liquidation instructions.

Plaintiff has demonstrated a sufficient likelihood of success on the merits of this action to support the issuance of the prayed-for Preliminary Injunction against CBP's liquidation of its entries at the PRC-Wide-Entity rates.


Respectfully Submitted,

    /s/ John M. Peterson   
John M. Peterson
Maria E. Celis
Neville Peterson LLP
Counsel for Plaintiff Target Corporation
17 State Street, 19th Floor
New York, NY 10004
(212) 635-2730
jpeterson@npwny.com

Of Counsel:

Russell A. Semmel (NY Bar Admission pending)*
Richard O'Neill (WA Bar Admission pending)*

* Parties to Judicial Protective Order in this action.